IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BILL DARRAH BUILDERS, INC., | CIV. NO. 15-00518 JMS-KSC |
| Plaintiff, | |
| vs. | ORDER DENYING IN PART AND GRANTING IN PART MOTIONS FOR SUMMARY JUDGMENT, ECF NOS. 108, 112 |
| HALL AT MAKENA PLACE, LLC, et al. | |
| Defendants. | |

## ORDER DENYING IN PART AND GRANTING IN PART MOTIONS FOR SUMMARY JUDGMENT, ECF NOS. 108, 112

## I. INTRODUCTION

Defendants Hall at Makena Place, LLC, and Craig and Kathryn Hall (collectively, "Hall" or "the Halls") move for summary judgment on all Counts against them in Plaintiff Bill Darrah Builders, Inc.'s, ("BDB") Complaint, and they move for partial summary judgment on their First Amended Counterclaim ("FACC") against Bill Darrah ("Darrah") and BDB. ECF No. 112. Darrah and BDB move for summary judgment on all Counts asserted in the FACC. ECF No. 108. Because the court finds disputed issues of material fact, Hall's Motion is DENIED. BDB and Darrah's Motion is GRANTED as to Count IV of the FACC,

deceptive trade practices under Hawaii Revised Statutes ("HRS") § 481(A), but it is DENIED as to all other Counts.

## II. **BACKGROUND**

### A.      **Factual Background**

Defendant Hall at Makena Place, LLC, ("Hall Company") owns a property on Maui that was the subject of a renovation project ("the Project"). FACC ¶ 7.  Through Matt Mumford ("Mumford"), Defendants Kathryn and Craig Hall's representative, Hall Company entered into a "Cost Plus Contract" (the "Contract") with BDB for the Project.  Mumford Decl. ¶ 2, ECF No. 113-2; ECF No. 113-14.  According to Darrah, when he and Mumford "began discussing the renovation, only approximately four pages of rough architectural plans and some structural drawings had been completed for use by prospective contractors.  The accompanying project description was limited to high-level bullet points by area with no specific materials specified."  Darrah Decl. ¶ 7, ECF No. 113-5.  Based on these drawings, Darrah estimated the cost of the Project at approximately 3.1 million dollars.  *Id*. Ex 5, ECF No. 113-5 at 28.  This "Estimated Budget," as well as the preliminary construction and structural drawings, were incorporated into the Contract, and the Contract provides that these "Contract Documents" "shall become part of this Contract and shall include all labor, materials, equipment and supplies for the [P]roject."  Contract §§ 1(C), 4(D); ECF No. 113-15.

But the Contact clearly contemplates that the original plans would be augmented. The Contract refers to "additional work orders that are not included in the original Scope of Work," and it states that "[w]ork not expressly shown or written on the Construction Drawings" may be required. *Id*. §§ 3(A)(4), 4(D). It also acknowledges that "[a]dditional work may require additional cost and may not be included in the Estimated Budget." *Id*. § 4(D). And it provides that the Estimated Budget shall not "limit or otherwise modify or be construed to limit or modify Owner's obligation to pay all of the costs of the work."[1] *Id*. § 3(E)(8).

The Contract includes the following provision regarding "Changes or Additional Work."

> The Owner may request changes to the work or additional work. Any additions, deletions or other changes to the written Scope of Work, Construction Drawings, the work, or the terms of this Contract shall be made by written change orders signed by both the Owner and Contractor ("Change Order"). Contractor shall not be obligated to perform such change until a written Change Order on Contractor's then current standard

---

[1] The Contract identifies the Hall Company (formerly Estate at Makena Place, LLC) as "Owner" and BDB as "Contractor." Contract at 1; *see also* Mumford Decl. ¶ 2. The full text of § 3(E)(8) is as follows:

> Estimated Budget — The estimated budget and estimate of the cost of the work is attached hereto as Exhibit A. Said budget shall not be construed to be a representation, warranty, guaranty, covenant or agreement of any kind by the Contractor that the Estimated Budget or any component thereof shown on such budget or estimate shall be limited to the amount shown on such budget or estimate, and no such budget or estimate shall limit or otherwise modify or be construed to limit or modify Owner's obligation to pay all of the costs of the work.

form, describing the change and any change in the
Estimated Budget (defined in Section 3.E.8) and in the
Final Completion date relating to that change, has been
signed by both Owner and Contractor. However,
Contractor may elect at its' (sic) option, to perform a
change that has been verbally approved or requested by
Owner, prior to a written Change Order being signed by
Owner and Contractor for that change, in order to prevent
delay or increased costs or fees, and if Contractor so
performs such change, Owner agrees to sign a Change
Order for that change, describing that change and
adjusting the Estimated Budget and the Final Completion
date. Contractor will use a rate of 15% of all net
increases in the total cost of the work resulting from each
Change Order that exceeds the estimated budget . . . .
Payments for Change Orders are due and payable as the
cost of the work is incurred in accordance with the
payment schedule in Section 3.I.3.

*Id*. § 3(D).

The Contract also includes provisions regarding the allocation of

costs.

### E.  Costs to be Reimbursed or Paid Directly by Owner

The term "cost of the work" shall include costs set forth below
incurred in the proper performance of the Contractor's work and paid
by the Contractor or directly by Owner:

1.      Wages paid for labor, including overtime for
        employees of the Contractor in the performance of
        the work, State Unemployment Taxes, Federal
        Unemployment Taxes, Social Security, medical
        and other benefits paid to employees. The Wage
        Rate Schedule is as follows:

| | | |
|---|---|---|
| Laborer | rate at | $48 per hour |
| Carpenter | rate at | $62 per hour |
| Finish Carpenter | rate at | $69 per hour |
| Lead Carpenter | rate at | $75 per hour |
| Superintendent | rate at | $85 per hour |
| Project Manager | rate at | $85 per hour |
| Bill Darrah | rate at | $150 per hour |

. . . .

### F. Costs not to be Reimbursed

The cost of the work shall not separately include:

1. Any general insurance costs and state and federal taxes of Contractor (e.g., workers' compensation, comprehensive general liability insurance, auto insurance, health insurance, or labor burden expenses such as state and federal employer taxes, etc.). Contractor has factored these costs into the Wage Rate Schedule for Contractor's employees . . . above, or these costs will be paid out of the Contractor's Fee.

Contract § 3.

In addition to the "costs to be reimbursed to the Contractor," the Contract requires payment of a "fixed fee equal to $325,000" as well as a $75,000 bonus for timely completion of the Project. *Id*. § 3(A). And it provides that "[i]f the Total Cost of the Work (including the fixed fee and bonus) exceeds $3,100,000 then the Contractor will be paid an additional Contractors fee of 15% on all costs of the work that exceed $3,100,000." *Id*. § 3(A)(3). Regarding the payment schedule, the Contract requires initial deposits and biweekly payments based on

5

invoices submitted by BDB.  *Id.* § 3(I)(3)(a-b).  Such payments are to include a "pro rata amount of the Contractor's Fee" and are to be paid within ten days of receipt.  *Id.*

BDB began work on the Project in March 2014.  Mumford Decl. ¶ 21, ECF No. 113-2.  By July, the parties were at odds over costs, which had increased to a new estimate of over five million dollars.  *Id.* ¶¶ 32-35.  Hall appears to concede that some of the additional costs were warranted based on unforeseen problems with the existing structure and systems as well as design changes and/or finish selections, and the record includes twelve "change order proposals" that are signed by both Darrah and Mumford.  ECF No. 113-19, -21, -25 to 31.  The exact amount of increased charges Hall believes is legitimate, however, is unclear.

Hall attributes most of the increased costs to mismanagement on the part of BDB, including estimating errors, improper cost control, and excessive or improper wage and overtime charges.  *See* Mumford Decl. ¶¶ 25, 32-33, 37, 43, 49; Mumford Letter, Aug. 25, 2014, ECF No. 113-42; Hall Mot. at 17-18.  BDB contends that the increased costs were due to changes in the scope of work, continual design changes, and high-end material and finish choices.  Opp. at 104, ECF No. 148; Darrah Decl. ¶¶ 11-15.  BDB also contends that it understood Hall's highest priority was meeting the contract deadline, not keeping costs within an

original estimate that was merely preliminary and based on incomplete information.  Darrah Decl. ¶¶ 11-15, ECF No. 113-4.

Hall stopped paying BDB's invoices sometime in August 2014, and BDB stopped work in September, leaving the Project incomplete.  Mumford Decl. ¶ 52; Darrah Decl. ¶ 17.  Hall estimates the Project was about 50% complete at the time work stopped.  Mumford Decl. ¶ 58.

## B.    Procedural Background

BDB filed its Complaint on December 15, 2015, alleging Claims for breach of contract, promissory estoppel/unjust enrichment, and negligent or intentional misrepresentation.  ECF No. 1.  Hall filed a Counterclaim on February 19, 2016, ECF No. 13, and the FACC on May 26, 2016, alleging four Counts: (I) breach of contract (against BDB); (II) misrepresentation (against BDB and Darrah); (III) unfair and deceptive trade practice under HRS § 444-25.5 (against BDB); and (IV) unfair and deceptive trade practice under HRS § 481(A) (against BDB and Darrah).  ECF No. 80.

On September 27, 2017, Hall moved for summary judgment on all Counts in the Complaint and on Counts I, II, and IV of the FACC, and BDB and Darrah moved for summary judgment on all Counts in the FACC.  ECF Nos. 108, 112.  The parties filed Oppositions on December 18, 2017, ECF Nos. 146, 148, and the Halls supplemented their Opposition on January 2, *see* ECF Nos. 256, 157.

The parties filed their Replies on December 22, 2017, ECF Nos. 151, 152. A hearing was held on January 8, 2018. ECF No. 158.

### III. <u>STANDARD OF REVIEW</u>

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden initially lies with the moving party to show that there is no genuine issue of material fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is material if the resolution of the factual dispute affects the outcome of the claim or defense under substantive law governing the case. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex*, 477 U.S. at 323-24. "There is no genuine issue of fact if the party opposing the motion 'fails to make an adequate showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (quoting *Celotex*, 477 U.S. at 322). Moreover, there is no genuine issue of material fact if, taking the record as a whole, a rational trier of fact could not find in favor of the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; *Taylor*, 880 F.2d at 1045.

## IV.  DISCUSSION

Because the court finds disputed issues of material fact as to whether any of BDB's work was unauthorized, unnecessary, or otherwise outside the scope of the Contract, Hall's Motion for Summary Judgment is DENIED as to the Claims for breach of contract, promissory estoppel, and unjust enrichment. As explained below, however, the court rejects Hall's interpretation of the Contract as (1) including overtime within the wage rates described in § 3(E), and (2) conditioning Hall's payment obligation on the existence of executed Change Orders for work billed in excess of the Estimated Budget. The court also finds material issues of

fact regarding the Claims of misrepresentation; therefore, Hall's Motion for Summary Judgment is DENIED.[2]

BDB's Motion for Summary Judgment is GRANTED as to Count IV of the FACC, but it is otherwise DENIED.

## A. Hall's Motion for Summary Judgment

### 1. Breach of Contract

BDB alleges that Hall breached the Contract by failing to pay for "work performed, materials ordered, and costs associated with the Project." Compl. ¶ 74. And it alleges that in so doing, Hall also breached the implied covenant of good faith and fair dealing.[3] *Id*. ¶ 75. In the FACC, Hall alleges that BDB breached the Contract by failing to complete the Project for the cost stated in the Estimated Budget plus the signed change order proposals and by failing to adhere to the change order process in the Contract. FACC ¶¶ 28-30, 59-63. Hall also asserts that BDB overbilled for work, specifically by charging for overtime

---

[2] Because the court grants BDB and Darrah's Motion for Summary Judgment on Count IV of the FACC, Hall's arguments on that Count (made on different grounds) are moot.

[3] Parties to commercial contracts in Hawaii have a statutory duty to perform in good faith, *see* HRS § 490:1-304, and Hawaii law recognizes that "every contract contains an implied covenant of good faith and fair dealing that neither party will do anything that will deprive the other of the benefits of the agreement." *Best Place, Inc. v. Penn Am. Ins. Co.*, 82 Haw. 120, 123-24, 920 P.2d 334, 337-38 (1996) (citations omitted). But as this court has explained, outside of an insurance contract, "this obligation does not create an independent cause of action." *Gray v. OneWest Bank, Fed. Sav. Bank*, 2014 WL 3899548 at *9 (D. Haw. Aug. 11, 2014); *see also Courter v. Karolle*, 2013 WL 2468360, at *11 (D. Haw. June 6, 2013).

that was not allowed under the Contract. *Id.* ¶¶ 28, 64. Hall moves for summary judgment on the breach-of-contract claims in both the Complaint and the FACC. Mot. at 1.

Hall's Motion fails largely because it depends on incorrect interpretations of the Contract. Generally, contract interpretation is a question of law. *See Hanagami v. China Airlines, Ltd.*, 67 Haw. 357, 364, 688 P.2d 1139, 1144 (1984) (holding that the construction and legal effect of a contract is a question of law).

Hall interprets § 3(D) of the Contract to require an executed "Change Order" for any work that exceeds the Estimated Budget. Mot. at 17-20. Because BDB billed for work done without such executed Change Orders, Hall contends that BDB breached the Contract. *Id.* at 17. But § 3(D) does not require what Hall contends it requires. First, the Change Order described in § 3(D) only applies to "additions, deletions or other changes to the written Scope of Work, Construction Drawings, the work, or the terms of th[e] Contract." It does not apply to mere variances between the actual cost of work and the approximate costs described in the Estimated Budget. In other words, before § 3(D) even comes into play, there must be some sort of *change* to the work required or to the terms of the Contract. To the extent that Hall contends that a Change Order was required every time an item addressed in the Estimated Budget turned out to be more expensive than

originally estimated (but not otherwise added, deleted or changed), that contention fails.

Second, § 3(D) does not prohibit BDB from actually performing work before receiving an executed Change Order — even if the work does represent an addition, deletion or change for which a Change Order could be required — and it does not condition payment on the existence of timely executed Change Orders. Rather, it expressly allows BDB "at its' (sic) option, to perform a change that has been verbally approved or requested by Owner, prior to a written Change Order being signed by Owner and Contractor for that change, in order to prevent delay or increased costs and fees."[4] Contract § 3(D). And it further requires that, if "Contractor so performs such change, Owner agrees to sign a Change Order for that change, describing that change and adjusting the Estimated Budget and the Final Completion date." Indeed, nothing in § 3(D) requires that, in order to carry out the Project or implement Hall's design choices, BDB must submit a Change Order proposal at all, let alone within two weeks of beginning work on any requested change, as Hall suggests.[5]

---

[4] In Hall's brief, Counsel selectively quotes § 3(D) of the Contract, giving the impression that the Contract *always* requires an executed Change Order. Such a selective recitation of a contract provision is misleading, and, to be clear, more is expected of Counsel.

[5] Hall apparently bases this contention on § 3(I)(3)(a) of the Contract, which states that "[o]n a biweekly basis, Contractor shall submit to Owner or lender invoices for direct payment to Contractor, including a pro rata amount of Contractor's Fee and any Change Order Fees." But it

(continued . . .)

This is not to say that the Contract gave BDB unfettered discretion or allowed BDB to carry out work at the Property that Hall did not approve or request. And the court finds genuine issues of fact regarding whether all the work for which BDB billed or for which it seeks payment was, in fact, approved or requested. Darrah states that "[d]uring the construction period, [Hall] made multiple changes to the plans and increased the scope of work" and made materials selections for which BDB incurred expenses. *See* Darrah Decl. ¶¶ 11-15. And the record contains a summary list of "some of the tasks" BDB contends it was "directed to do by Owners Representatives." ECF No. 113-54. Hall disagrees and cites Mumford's declaration that "[m]ost of [the disputed changes] were never approved." Mumford Decl. ¶ 41. Neither party attempts to itemize changed or additional work or to explain, item by item, whether (and by whom) such work was requested or approved.

The court also finds a question of fact as to who could properly approve or request work. Hall contends that "Mumford was the only person authorized to approve Change Orders[,] and the Contract was never modified to allow others to approve Change Orders." ECF No. 113, ¶ 19. But the Contract is silent as to who may speak for Hall. Indeed, Mumford is mentioned only in the

(. . . continued)
simply does not follow, as Hall suggests, that "a timely change order must be presented to the Owner as new scope of work arises." Mot. at 20.

address block on the Contract, and the Contract clearly gives at least some authorizing power to the architect in stating, "Work not expressly shown or written on the Construction Drawings will not be required unless in written form from the Owner *or Architect*." Contract § 4(D) (emphasis added).

Moreover, it is a question of fact whether BDB could properly take direction from Hall's various design planners. It appears to be uncontested that BDB had direct access to these individuals and was encouraged to communicate with them. *See* ECF No. 113, ¶ 21; Joseph Soisson Dep. 43:8-44:7, ECF No. 113-10. Hall submits an email that highlights the factual issue. In it, Mumford attempts "to make the approval loop clear" and require that BDB seek Mumford's approval for finishes costlier than BDB's "Budget allocation" even if "the Halls [have] approve[d]" of the finish. But the email is dated July 8, 2014 — well after much work had been completed, *see* ECF No. 113-18 — and it is unclear what the parties' practice or understanding was before that date.

Finally, Hall's claim that BDB improperly charged for overtime is also based on an incorrect interpretation of the Contract. Hall points to a single phrase in § 3(E)(1) stating, "Wages paid for labor, including overtime for employees of the Contractor in the performance of the work, State Unemployment Taxes, Federal Unemployment Taxes, Social Security, medical and other benefits paid to employees." But Hall ignores the context of the phrase: it appears under

the heading "Cost to be Reimbursed or Paid Directly by Owner," and it is part of a list of costs to be included in the "cost of the work" for which Owner is responsible. Contract § 3(E). Although § 3(F) of the Contract specifically states that some of these expenses, including "state and federal taxes of Contractor (e.g. workers' compensation, comprehensive general liability insurance, auto insurance, health insurance, or labor burden expenses such as state and federal employer taxes, etc.)" will not be separately billed because "Contractor has factored these costs into the Wage Rate Schedule," that section does not list "overtime" as such an expense. Therefore, on the record presently before it, the court finds that the cost of overtime is not included in the hourly wage rates, as Hall contends, and BDB did not breach the Contract merely by billing for overtime.[6] To the extent

---

[6] In its Motion and Reply, Hall argues that the Contract *expressly* includes overtime in the stated wage rates. *See* Mot. at 21, 29; Reply at 16, ECF No. 151. At the hearing, Hall offered the additional theory that if the Contract does not expressly include overtime in the stated wage rates, overtime was at least implicitly included in those rates because the rates stated are two to three times higher than the wages BDB actually paid its employees. But that inference is unreasonable. As Hall's own expert, Andrew Tanton, explains (and common sense dictates), "[t]he actual cost for BDB's employees was more than the wage it paid them, as BDB likely contributed for fringe benefits and mandatory funds such as FICA, FUTA, SUI as well." Tanton Report, ECF No. 147-7 at 13. Indeed, the Contract expressly provides that "general insurance costs and state and federal taxes of Contractor (e.g. workers' compensation, comprehensive general liability insurance, auto insurance, health insurance, or labor burden expenses such as state and federal employer taxes, etc.)," although they are the responsibility of Owner to pay related to the work, have been "factored . . . into the Wage Rate Schedule." Contract § 3(E), (F). Thus some discrepancy between wages actually paid to the employees and those stated in the Contract is to be expected; how much depends on the cost of the items identified in § 3(F), which Tanton and Hall admit they do not have. In the face of express provisions in the Contract, a discrepancy in wage rates alone, even a large one, does not permit the inference that Hall asks the court to make.

(continued . . .)

Hall has alleged that overtime was unnecessary, however, or that the wage rates were otherwise impermissibly inflated, those determinations remain questions of fact for trial.

Because Hall's Motion for Summary Judgment on the breach-of-contract claims depends on incorrect interpretations of the Contract, and because the above identified questions of fact are material to the breach-of-contract claims, Hall's Motion for Summary Judgment on these Counts is DENIED.

### 2.     *Promissory Estoppel/Unjust Enrichment*

The elements of promissory estoppel are (1) a promise, (2) foreseeability (the promisor must foresee reliance by the promise at the time the promise is made), (3) reliance, and (4) the necessity of enforcement to avoid injustice. *Gonsalves v. Nissan Motor Corp. in Haw., Ltd.*, 100 Haw. 149, 164, 58 P.3d 1196, 1211 (2002). "The essence of promissory estoppel is detrimental reliance on a promise." *Id*. at 165, 58 P.3d at 1212 (internal quotation marks and citation omitted). "[A] 'promise' for purposes of promissory estoppel [is] a

_____

(. . . continued)

Moreover, although Counsel claimed at the hearing that information about the wages BDB actually paid to its employees is included in the record, the court has found only a single page of a payroll ledger (related to only a handful of employees and to only a single week of work) with such information. *See* Tanton Report Ex 17, ECF No. 147-11 at 66.  The court reminds Counsel that judges are not "like pigs, hunting for truffles" in the record, and all arguments must be clearly briefed with citations to supporting evidence. *United States v. Dunkel*, 927 F. 2d 955, 956 (7th Cir. 1991).

manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promise in understanding that a commitment has been made." *Id*. (internal quotation marks and citation omitted.)

To prove unjust enrichment, BDB must show that Hall received a benefit without adequate legal basis and that Hall has retained the benefit at BDB's expense. *See Porter v. Hu*, 116 Haw. 42, 53, 169 P.3d 994, 1005 (Ct. App. 2007). Courts have found it "axiomatic that a person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Id*. (quoting Restatement of Restitution § 1 cmt. b (1937)). But "where the parties to a contract have bargained for a particular set of rights and obligations, all claims involving those express rights and obligations properly lie in contract law and not in equity." *Keahole Point Fish LLC v. Skretting Can. Inc.*, 971 F. Supp. 2d 1017, 1040 (D. Haw. 2013). "It is . . . well settled in federal courts that equitable remedies are not available when an express contract exists between the parties concerning the same subject matter," and "Hawaii law has . . . endorsed application of this principle as well." *AAA Haw. LLC v. Haw. Ins. Consultants, Ltd*., 2008 WL 4907976 at *3 (D. Haw. Nov. 12, 2008) (citing *Porter*, 116 Haw. at 53, 169 P.3d at 1007). Nonetheless, Hawaii has also found that "[w]hile . . . an action for unjust enrichment cannot lie in the face of an express contract, a contract does not

preclude restitution if it does not address the specific benefit at issue." *Porter*, 116 Haw. at 54, 169 P.3d at 1006.

BDB alleges that throughout the Project it relied on Hall's promise to pay for the work it did. Compl. ¶¶ 80-81. It concedes that it can "invoke these claims only in the absence of an express contract." Opp'n at 16-17, ECF No. 148 (*citing Balboa v. Haw. Care & Cleaning, Inc.*, 105 F. Supp. 3d 1165, 1174 (D. Haw. 2015), and *Porter*, 116 Haw. at 53, 169 P.3d at 1005). But it asserts that, should the court accept Hall's contention that work was done outside the scope of the Contract (but still in reliance on a promise to pay), or that the Contract is somehow invalid or unenforceable, it may still recover in equity. *Id.* at 17.

Because Hall's Motion relies at least in part on the very contract-interpretation arguments that the court has rejected above, and because Hall also contends that the Contract should be "deemed null and void" as a result of BDB's alleged misrepresentations, summary judgment on these Counts is DENIED.

### 3. *Misrepresentation*

Count Three of the Complaint asserts a claim for negligent and intentional misrepresentation based on Hall's allegedly false representations that it would not hold BDB to a budget that the parties' agreed was merely a preliminary estimate. Compl. ¶¶ 91-100. Hall's misrepresentation claim in Count Two of the FACC is based on BDB's allegedly false marketing materials stating that BDB

"had the skills and experience necessary to perform the Scope of Work in the contract," that BDB "had a reliable team of personnel, and that they completed jobs 'on time and on budget.'" FACC ¶ 69.

Negligent misrepresentation has the following elements, (1) false information "supplied as a result of the failure to exercise reasonable care or competence in communicating the information," (2) reliance on that false information, and (3) resulting loss. *Santiago v. Tanaka*, 137 Haw. 137, 153-54, 366 P.3d 612, 628-29 (2016). Intentional or fraudulent misrepresentation requires proof of (1) false representations, (2) made with "knowledge of their falsity (or without knowledge of their truth or falsity)[,] (3) in contemplation of . . . reliance upon these false representations," and (4) actual reliance. *Assoc. of Apt. Owners of Newtown Meadows v. Venture 15, Inc.*, 115 Haw. 232, 256, 167 P.3d 225, 263 (2007).

Hall moves for summary judgment as Plaintiff on its claim based on BDB's marketing. This motion is DENIED. Even rejecting for the sake of argument BDB's opposing argument that the marketing statements were merely unactionable puffery,[7] there are clearly questions of fact regarding whether Hall relied on the statements in entering into the Contract.

---

[7] BDB has not made this assertion as part of its own Motion for Summary Judgment on this Claim.

Hall moves as Defendant on BDB's claim regarding the treatment of the Estimated Budget. This motion too is DENIED. Hall's first contention — that BDB falsely claims the Halls failed to inform BDB they would expect BDB to adhere to the Estimated Budget, *see* Mot. at 24-25 — requires a credibility determination not properly made on summary judgment. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact-finder] functions, not those of a judge . . . ruling on a motion for summary judgment."). Hall's second contention is not supported with any legal argument. Hall states that there is "no evidence of any misrepresentation made by Craig or Kathryn Hall to BDB or Bill Darrah directly." *Id*. at 25. But Hall cites no authority for the proposition that a representation must be made directly, rather than through an agent or representative. A movant has the burden of demonstrating it is entitled to summary judgment as a matter of law. Hall has failed to meet that burden.

**B.     BDB's Motion for Summary Judgment**

BDB moves for summary judgment on all Counts Hall has asserted in the FACC based on its contention that Hall cannot quantify its alleged damages to a reasonable degree of certainty. Mot. at 2-3, 5, 11. With regard to Count IV of the FACC alleging deceptive trade practices under HRS § 481A, Hall also

contends that damages are not an available remedy and that this Count fails as a matter of law on that ground as well.  Mot. at 10-11.

BDB's argument regarding proof of damages is simply wrong.  It is based on a contention that Hall has no admissible expert testimony on damages, but even if that were true, BDB cites no authority to support its argument that expert testimony is necessary for any of Hall's claims.  Damages may not be quantifiable at this point, but not because of a lack of expert evidence.  Rather, they are not quantifiable because underlying factual questions as to breach/liability are yet to be determined.

Regarding Count IV of the FACC, however, BDB contends that § 481A provides an exclusive remedy of injunctive relief, not damages.  Mot. at 10-11.  The Halls failed to address this contention in their Opposition, and Counsel was unprepared to discuss it at oral argument.  Nonetheless, the court has "an obligation to evaluate independently the sufficiency of the moving papers."  *Lopez-Gomez v. Sessions*, 693 Fed. Appx. 729, 731 (9th Cir. 2017).

Section 481A-4 provides that "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable."  "The relief provided in this section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this State."  HRS

§ 481A-4(c). But it does not itself provide for damages as a remedy, and Hall has not requested injunctive relief.[8] Nor can the court read Count IV as alleging any other or additional common-law or statutory violation that might entitle Hall to damages, including any violation of HRS Chapter 480. Although paragraphs 85 and 87 of the FACC (which are expressly incorporated in Count IV) mention Chapter 480, they do so only in connection with alleged violations of HRS § 444-25.5 Summary judgment on Count IV of the FACC is GRANTED.

## V. <u>CONCLUSION</u>

Hall's Motion for Summary Judgment is DENIED in its entirety. BDB's Motion for Summary Judgment is GRANTED as to Count IV of the FACC; it is DENIED as to all other Counts. All Counts in the Complaint and Counts I through III of the FACC remain for trial.

As a matter of law, the court interprets the Contract *not* to condition Owner's payment obligations for approved or requested work on the existence of executed Change Orders described in § 3(D) of the Contract.

Based on the current record, the court rejects Hall's contention that the Wage Rate Schedule in § 3(E)(1) of the Contract includes overtime; however,

---

[8] Further, a party has standing to seek prospective injunctive relief only if it can show that it "is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that [it] will again be wronged in a similar way." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (internal quotation marks and citations omitted). Presumably, Hall isn't contending that it would again be fooled by BDB's allegedly misleading advertising.

the court makes no determination at this time regarding the admissibility of additional evidence on this point at trial.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, January 31, 2018.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Bill Darrah Builders, Inc. v. Hall*, Civ. No. 15-00518 JMS-KSC, Order Denying in Part and Granting in Part Motions for Summary Judgment, ECF Nos. 108, 112

23